**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| SHEILA DARLENE BUTLER, <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF LABOR, <u>et al.</u>, <br><br> Defendants. |

Case No. 16-cv-1115 (CRC)

## **MEMORANDUM OPINION**

Plaintiff Sheila Butler's husband tragically perished in a fire while working at an Ohio natural gas facility. Seeking evidence for a wrongful death action against the operators of the facility, Ms. Butler lodged a Freedom of Information Act request with the Department of Labor's Occupational Safety and Health Administration ("OSHA") for records related to its investigation of the incident. The Labor Department produced hundreds of documents in response to Butler's request, but withheld or redacted others based on a number of FOIA exemptions.

In this lawsuit, Butler mainly challenges the Department's withholding of three categories of records. *First*, OSHA obtained documents during its investigation from Mr. Butler's employer, Buffalo Gap Instrumentation and Electrical Company, and the facility's owner, Caiman Energy.[1] After both companies designated certain of those documents as confidential business information, the Department withheld them from Ms. Butler under FOIA Exemption 4, which shields trade secrets and other proprietary commercial information from disclosure. Butler contends that the disputed records do not meet the requirements of that

---

[1] Caiman Energy is a member of a joint venture known as Blue Racer which operates the facility. For ease of reading, the Court will refer to both entities as Caiman Energy.

exemption. *Second*, Butler objects to the Department's withholding, under Exemption 7(C), of the names and addresses of witnesses who provided statements to OSHA during its investigation. *Finally*, Butler challenges the withholding of the witness statements themselves pursuant to Exemption 7(D).

The parties have filed cross motions for summary judgment. As explained below, the Court will grant the Department's motion (and deny Butler's), except as to one document that it appears the Department should have released in redacted form rather than withheld entirely.

I. **Legal Standard**

The Court can award summary judgment to an agency if it "proves that it has fully discharged its obligations under FOIA, after the underlying facts and inferences to be drawn from them are construed in the light most favorable to the FOIA requester." Tushnet v. ICE, 246 F. Supp. 3d 422, 431 (D.D.C. 2017). An agency must adequately justify any withholdings it makes under FOIA's exemptions from disclosure. Exemptions are construed narrowly and the agency bears the burden of establishing that every withholding is justified. See, e.g., DiBacco v. U.S. Army, 795 F.3d 178, 183 (D.C. Cir. 2015).

II. **Analysis**

The Court will begin with the Department's assertion of Exemption 4 to withhold documents designated by Buffalo Gap and Caiman Energy as confidential. It will then turn to the materials from OSHA's investigative interviews that were withheld under Exemptions 7(C) and 7(D).

A. Exemption 4

FOIA Exemption 4 prohibits agencies from disclosing "privileged or confidential" "trade secrets and commercial or financial information" obtained from third parties. 5 U.S.C. §

552(b)(4). The level of protection afforded to such information for purposes of Exemption 4 depends on whether it was submitted to the government voluntarily or not. Information submitted voluntarily is subject to greater protection from disclosure than information that was compelled by the government. See Critical Mass Energy Project v. Nuclear Regulatory Com'n, 975 F.2d 871, 878 (D.C. Cir. 1992). Here, Buffalo Gap and Caiman Energy were required to produce documents to OSHA in connection with its investigation. See First Plick Decl. ¶ 39. As a result, the protection of the information at issue is more limited. Under the test laid out by the D.C. Circuit in National Parks and Conservation Ass'n v. Morton, information compelled by the government can only be withheld under Exemption 4 if disclosure would likely (1) impair the government's ability to obtain necessary information in the future or (2) cause substantial harm to the competitive position of the person from whom the information was obtained. 498 F.2d 765, 770 (D.C. Cir. 1974). The Department argues that the second prong applies to the documents it withheld under Exemption 4, so the question is whether disclosure is likely to cause substantial harm to the competitive position of Caiman Energy or Buffalo Gap. The Department withheld two categories of documents pursuant to Exemption 4.

*1. Lockout/Tagout Procedures*

The first category consists of forms and training materials related to Caiman Energy's "Lockout/Tagout" procedures—safety protocols designed to ensure that industrial equipment is disabled while it is being serviced. (The fire that killed Mr. Butler apparently started while he was working on a piece of equipment at the Caiman Energy facility). Agencies seeking to avoid the disclosure of information under the competitive injury prong of the National Parks test must show a likelihood of substantial competitive injury if the information were disclosed. 547 F.2d at 770. The burden is therefore on the Department to show that Caiman Energy would likely

3

suffer substantial competitive injury if it were forced to disclose the company's Lockout/Tagout procedures. Courts generally defer to an agency's prediction of competitive harm from disclosure. United Technologies Corp. v. U.S. Dep't of Defense, 601 F.3d 557, 563 (D.C. Cir. 2010).

The Department has filed a declaration by Richard D. Moncrief, President and Chief Operating Officer of Caiman Energy, attesting that the release of the Lockout/Tagout procedures would likely harm Caiman Energy's competitive standing for several reasons. To start with, the procedures include information about how, when, and why equipment is taken out of service, including the length and frequency of lockouts and other maintenance activities. Moncrief Decl. ¶ 3. According to Mr. Moncrief, this information could be used to deduce Caiman Energy's "expenses, operations downtime, and techniques for maintaining equipment." Id. Additionally, Moncrief says, the Lockout/Tagout procedures could be used to learn how Caiman Energy trains employees with respect to this equipment. Id. And because Caiman Energy had to expend "considerable effort and money to develop" the Lockout/Tagout procedures and related training materials, it would harm Caiman Energy's competitive standing if its competitors could obtain that information for free. Id.; Def.'s Reply at 7.

Ms. Butler does not meaningfully dispute the competitive harms asserted by Mr. Moncreif. She argues instead that the Lockout/Tagout procedures are not protected by Exemption 4 because they were adopted to comply with OSHA's *published* safety regulations related to the use of hazardous equipment. Pl.'s Cross-Mot. Summ. J. at 11, citing 29 C.F.R. 1910.147. But just because the Department's regulations and standards are known to the public does not mean the methods by which companies meet those standards are public knowledge as well. In fact, as the Department points out, "[t]here is an entire industry of service providers who

4

assist companies in developing OSHA-compliant procedures." Def.'s Reply at 7 (noting one such provider). In light of the uncontested facts presented in the Moncrief declaration, the Court finds that the release of the Lockout/Tagout materials would likely cause substantial harm to Caiman Energy's competitive position. The Department's assertion of Exemption 4 to withhold those materials was therefore proper.

       2. *Master Service Agreement: Appendix C*

The second set of documents that the Department withheld under Exemption 4 comprise "Appendix C" to a Master Service Agreement between Buffalo Gap and Caiman Energy that governed Buffalo Gap's work at the facility. The Department attests that each of the appendix's four pages contain pricing, rental rates, and cost information for the various services and equipment that Buffalo Gap provided under the agreement, the release of which would cause Buffalo Gap competitive harm. Second Plick Decl. ¶¶ 10–13. Butler does not dispute that Buffalo Gap's pricing and cost data are covered by Exemption 4. She argues, rather, that she is entitled to the appendix with the proprietary data redacted. See Pl.'s Cross-Mot. Summ. J. at 4. The Court agrees. Butler does not say how the appendix would be meaningful without the pricing and cost data. But nor does the Department explain how Buffalo Gap is likely to be harmed by the release of the document in redacted form. See Second Plick Decl. ¶¶ 10–13 (disclosing Appendix C would allow competitors to use *pricing information* to estimate Buffalo Gap's expenses and undercut their prices when bidding for contracts and job offers). Because FOIA requires that "any reasonably segregable portion of a record shall be provided" to a requester, the Court finds that the Department has not met its burden to establish the applicability of Exemption 4 to the entire document. 5 U.S.C. § 552(b). The Department must therefore release Appendix C to Ms. Butler after redacting all exempt data.

B. Exemption 7(C)

Next, Butler challenges the Department's decision to withhold the names and addresses of witnesses who spoke with OSHA during its investigation of Mr. Butler's death. The Department based the withholding on Exemption 7(C), which protects "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). [2]

As the threshold, Butler argues that the Department cannot rely on Exemption 7 because that exemption applies only to records or information compiled for "law enforcement purposes," 5 U.S.C. § 552(b)(7), and the Department has not shown that the witness names and addresses are related to any law enforcement purpose. [3] Not so. For Exemption 7 to apply, the agency must have carried out the investigation to determine whether there was "an identifiable possible violation of law." Birch v. U.S. Postal Service, 803 F.2d 1206, 1210 (D.C. Cir. 1986). OSHA clearly met that standard here. It investigated a workplace accident that resulted in Mr. Butler's death to determine whether there were safety-related legal violations at the work site. See Cooper Cameron Corp. v. Dep't of Labor, 280 F.3d 539, 545 (5th Cir. 2002) (holding that OSHA met its burden of showing that it assembled inspection records for a law enforcement purpose where the records related to whether a company violated safety standards). The witness names

---

[2] The Court need not address the parties' dispute over whether Exemption 6 also applies to witness names and addresses because it concludes that Exemption 7(C), which provides broader privacy protection than Exemption 6, shields this information from disclosure. See U.S. Dep't of Justice v. Reporters Committee for Freedom of the Press, 489 U.S. 749, 756 (1989).

[3] Ms. Butler raises this argument for the Department's assertion of both Exemption 7(C) and Exemption 7(D) (addressed below). The Court will address the argument only once.

6

and addresses that were collected as part of that effort were, therefore, also compiled for a law enforcement purpose.

Ms. Butler further contends that Exemption 7(C) does not shield disclosure because the Department's privacy concerns are "ill-conceived[,]" and there are no legitimate privacy interests that would be harmed by disclosure of witness names and addresses.[4] Pl.'s Cross-Mot. Summ. J. at 12. But the threshold for forcing disclosure of private citizens' personal information in the context of Exemption 7(C) is high. The Supreme Court has concluded that "as a categorical matter . . . a third party's request for law enforcement records or information about a private citizen can reasonably be expected to invade that citizen's privacy." Reporters Committee, 489 U.S. at 780. And this Circuit has made clear that agencies may categorically withhold the names and addresses of private citizens appearing in files covered by Exemption 7(C) *unless* disclosure of that information is necessary to "confirm or refute compelling evidence that the agency is engaged in illegal activity[.]" SafeCard Services v. SEC, 926 F.2d 1197, 1206 (D.C. Cir. 1991).

Ms. Butler has not alleged that OSHA engaged in any illegal activity, let alone provided "compelling evidence" of any such conduct. Indeed, she admits that she seeks the witnesses'

---

[4] Butler argues that releasing the witnesses' names and addresses would not actually violate their privacy because those witnesses have "almost certainly" already been identified by name in discovery in Ms. Butler's wrongful death case, and many have been deposed. Defs.' Renewed Mot. Summ. J. at 12. But Exemption 7(C) still applies even if one can "piece together" the witness's identities through other means. See, e.g., Weisberg v. U.S. Dep't of Justice, 745 F.2d 1476, 1491 (D.C. Cir. 1984) (finding that a plaintiff's ability to deduce how alleged informants fit into an investigation did not undermine the informants' privacy interest in avoiding annoyance or harassment were the agency to *confirm* their identities); L & C Marine Transport, Ltd. v. U.S., 740 F.2d 919, 922 (11th Cir. 1984) (finding that an "individual does not lose his privacy interest under 7(C) because his identity as a witness may be discovered through other means."); Carpenter v. U.S. Dep't of Justice, 470 F.3d 434, 440 (1st Cir. 2006) (finding that an informant's privacy interests were not terminated or waived where there was a limited public disclosure hinting at the informant's cooperation with law enforcement).

names and addresses not to open up OSHA's activities to public scrutiny, but to aid her wrongful death action against Caiman Energy. Pl.'s Cross-Mot. Summ. J. at 12. And regardless of Butler's personal motivation for seeking this information, the Court concludes that disclosing the witnesses' names and addresses would do nothing to shed light on OSHA's actions. See McGehee v. U.S. Dep't of Justice, 800 F. Supp. 2d 220, 234 (D.D.C. 2011) ("the relevant question is not whether the public would like to know the names . . . but whether knowing those names would shed light on the FBI's performance of its statutory duties."). Because the witnesses' privacy interests outweigh any public interest here, the Court holds that Exemption 7(C) applies to protect this information from disclosure.

C. Exemption 7(D)

Finally, citing Exemption 7(D), the Department withheld a number of handwritten confidential witness statements given by employees who spoke to OSHA during its investigation. Exemption 7(D) applies to "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . (D) could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis." 5 U.S.C. § 552(b)(7)(D). Ms. Butler disputes that this exemption applies and seeks unredacted copies of all witness statements.

Again, the Department bears the burden of establishing that Exemption 7(D) shields the witness statements from disclosure. Dep't of Justice v. Landano, 508 U.S. 165, 171 (1993). When deciding whether the Department has met that burden, the relevant inquiry is whether the communications sought involve a confidential *source*, not whether the requested document itself is the type that the agency usually treats as confidential. Id. at 172. Sources are considered

confidential within the meaning of Exemption 7(D) if they spoke to law enforcement officials with the understanding that their communications would not be divulged (except to the extent necessary for law enforcement purposes). Id. at 174. Such an understanding can arise "under an express assurance of confidentiality or in circumstances from which such an assurance could be reasonably inferred." Id. at 172 (quoting S. Rep. No. 93-1200, at 13, U.S. Code Cong. & Admin. News at 6267, 6291).

The Department has established that the employee-witnesses here qualify as confidential sources because they clearly provided statements to the Department under an express promise of confidentiality. The forms used for the witness statements bear a legend at the top reading 'THIS IS A CONFIDENTIAL STATEMENT' and the signature line states 'I request that my statement, which was taken in private, be held confidential to the extent allowed by law. It will remain confidential unless I choose to discuss it with management personnel, or other parties.' Defs.' Renewed Mot. Summ. J. Ex. D (copy of form witness statement).

Ms. Butler argues that regardless of these assurances, the witnesses waived their right to confidentiality because a Caiman Energy attorney may have been present during their interviews. However, the Assistant Director of the OSHA office that conducted the investigation has submitted a declaration attesting that (1) it is his office's policy to not allow corporate counsel or other company representatives to be present when OSHA interviews non-management employees and (2) no Caiman Energy attorneys or representatives were present during the non-management employee interviews in this case. Wilson Decl. ¶¶ 8, 14. Butler contends that this evidence is undermined by a note indicating that a Caiman Energy attorney told OSHA he wanted to be present for any OSHA interview of the company's *general counsel*. Pl.'s Cross-Mot. Summ. J. Ex. 7. But that note does not support Butler's claim that a Caiman Energy

9

attorney was present at OSHA interviews with Caiman Energy *employee-witnesses*. Finally, a Caiman Energy attorney was indeed present for some interviews with Caiman Energy's management, but statements from those interviews have been released to Ms. Butler. Wilson Decl. ¶ 14. For the foregoing reasons, the Court holds that the witnesses were confidential sources whose identities are protected under Exemption 7(D).

Butler insists that even if the witnesses' identities are confidential, the statements should still be produced because the Department could easily redact witnesses' names from the statements and release the rest. Pl.'s Reply at 6. The question then becomes whether releasing the statements, sans names, could "reasonably be expected to disclose the identity of a confidential source[.]" 5 U.S.C. § 552(b)(7)(D). The Department advances several arguments for why releasing redacted witness statements could still reveal the witnesses' identities. First, it states there was a "small number of individuals" present at the accident site and even a single detail could reveal the identities of the employees who spoke with the Department. First Plick Decl. ¶ 49. See Doe v. Dep't of Justice, 790 F. Supp. 17, 21 (D.D.C. 1992) (finding that an agency must protect "even the most oblique indications of identity."). Second, the statements are handwritten, and the employers would "likely be familiar enough" with their employees' handwriting to be able to link the statements to the witnesses. First Plick Decl. ¶ 50. See Barnett v. U.S. Dep't of Labor, No. 09-146, 2010 WL 985225, at *1 (E.D. Tex. Mar. 15, 2010) (withholding "substantive factual information that reasonably can be expected to disclose the identity of a witness" including handwritten statement because handwriting analysis could be used to link statement to source); Ajluni v. FBI, 947 F. Supp. 599, 606 (N.D.N.Y. 1996) (finding information properly withheld where disclosure could result in narrowing sources "to a limited

group of individuals").⁵ Because the employee-witnesses who spoke to the Department are confidential sources and because the evidence suggests that releasing their statements would reveal their identities, the Court finds that the withheld witness statements are protected from disclosure under Exemption 7(D).

D. Adequacy of Search

One last issue remains: In the course of summary judgment briefing, Ms. Butler objected to the fact that OSHA had only searched its files related to Mr. Butler's employer, Buffalo Gap. It turns out that OSHA maintains its files based on company names and that it had neglected to search for responsive records in a separate file for Caiman Energy. First Plick Decl. ¶¶ 17–26. After Butler raised this argument, the parties moved to suspend briefing so that the Department could conduct an additional search. Unopposed Motion for Extension of Time to Complete Briefing (ECF. No. 13). After conducting that search, the Department discovered responsive documents related to Caiman Energy that had not been previously disclosed. First Plick Decl. ¶¶ 17–26.

Butler urges the Court to hold that the Department's initial search was inadequate. See Pl.'s Cross-Mot. Summ. J. at 10. But because the Department has since conducted what the parties agree is an adequate search, the Courts finds that the issue is moot. To the extent the adequacy of the initial search and the Department's disclosure of additional documents are

---

⁵ Revealing the confidential statements of witnesses who cooperate with the Department's investigations could have a chilling effect on cooperation by employee-witnesses in future investigations. See L & C Marine Transport, Ltd. v. United States, 740 F.2d 919, 924 (11th Cir. 1984) ("The great leverage that employers hold over workers and the possibility for retaliation make the circumstances surrounding an DOL investigation ones in which confidentiality is necessary").

relevant to whether Butler is entitled to attorneys' fees, the Court will consider those arguments as part of any fees litigation that may be necessary after the parties have had an opportunity to resolve that issue on their own. See Local Rule 54.2(a).

### III. Conclusion

For the foregoing reasons, the Court will grant Defendants' Renewed Motion for Summary Judgment in part and deny it in part. It will also grant Plaintiff's Cross-Motion for Summary Judgment in part and deny it in part. A separate Order shall accompany this Memorandum Opinion.

CHRISTOPHER R. COOPER
United States District Judge

Date: July 26, 2018